IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TRUDY BARNARD, | ) CASE NO. 1:20-CV-01711-JDG |
| Plaintiff, | ) |
| vs. | ) MAGISTRATE JUDGE |
| | ) JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) |
| | ) **MEMORANDUM OF OPINION AND ORDER** |
| Defendant. | ) |

Plaintiff, Trudy Barnard ("Plaintiff" or "Barnard"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.

I. PROCEDURAL HISTORY

In February 2018, Barnard filed an application for POD and DIB alleging a disability onset date of December 8, 2016 and claiming she was disabled due to lumbar post laminectomy syndrome; radiculopathy, lumbar; disorder of sacrum, fusion of spine; invertebral disc disorder with myelopathy; and severe radiating pain from lower back through calf. (Transcript ("Tr.") at 39, 106, 119.) The application

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

was denied initially and upon reconsideration, and Barnard requested a hearing before an administrative law judge ("ALJ"). (Tr. 39.)

On August 6, 2019, an ALJ held a hearing, during which Barnard, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On September 18, 2019, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 39-47.) The ALJ's decision became final on July 10, 2020, when the Appeals Council declined further review. (*Id.* at 1-7.)

On August 4, 2020, Barnard filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 17, 19.) Barnard asserts the following assignments of error:

(1) The ALJ erred when she adopted the residual functional capacity finding of the prior administrative law judge because she was bound by the holding in *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997).

(2) The ALJ erred in finding Ms. Barnard retained the residual functional capacity to perform work without proper consideration of her symptoms and nonexertional limitations.

(Doc. No. 1 at 10, 14.)

## II. EVIDENCE

**A. Personal and Vocational Evidence**

Barnard was born in April 1959 and was 60 years-old at the time of her administrative hearing (Tr. 39, 105, 118), making her a "person of advanced age" under Social Security regulations. *See* 20 C.F.R. § 404.1563(e). She has at least a high school education and is able to communicate in English. (Tr. 58.) She has past relevant work as a customer service manager, sales manager, and sales rep for manufactured equipment. (*Id.* at 71-72.)

**B.     Relevant Medical Evidence[2]**

On July 12-13, 2016, Barnard saw therapist Leanne Kelly for a functional capacity evaluation. (Tr. 474-86.)  Kelly noted that Barnard's movements were consistent with maximum effort, although Barnard limited some activities before objective signs of maximum performance because of reported discomfort in her back and right leg. (*Id.* at 475.)  Kelly determined Barnard's performance the second day was less than her performance the first day and opined that the second day's performance was "more reflective of what [Barnard] is capable of repeating on a day to day basis." (*Id.*)  Kelly found the following limitations: decreased sensation in the right leg; antalgic gait with limited stairs and carrying; decreased range of motion of the trunk and right lower extremity; decreased ability to sit for more than a couple of minutes, performing most sitting tasks while standing; and decreased ability to squat.  (*Id.*)  Kelly opined Barnard would need to be allowed to change positions to achieve occasional in sitting.  (*Id.* at 476.)

Barnard regularly saw treatment providers at Comprehensive Pain Management Specialists for her back and right lower extremity pain.  On January 16, 2017, Barnard saw Stephanie Whitling, PA-C.  (*Id.* at 396.)  Barnard described her pain as sharp, stabbing, and pulling.  (*Id.*)  Standing a long time, sitting a long time, and driving made her pain worse, while medications, lying flat, and repositioning relieved it. (*Id.*)  Whitling noted Barnard had tried acupuncture, bed rest, epidural injections, medications, surgery, and a TENS unit.  (*Id.*)  On examination, Whitling found Barnard in no acute distress and noted she stood the entire office visit and moved about the room without difficulty.  (*Id.*)  Barnard demonstrated tenderness of the right paravertebral muscles, midline tenderness at L4-5, mild limitation of extension of the lumbar spine, positive SI joint tenderness on the right, diminished sensation on the right dorsum and

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

plantar foot, and normal strength, coordination, and gait. (*Id.* at 397.) Whitling noted Barnard's medications continued to help, but Barnard did not like relying on them. (*Id.* at 398.)

Physical examination findings remained the same over Barnard's monthly pain management appointments throughout 2017. (*Id.* at 350-95.) On July 10, 2017, Whitling noted Barnard reported she loved helping with her grandchildren. (*Id.* at 373.) On August 7, 2017, Whitling noted that while Barnard was doing well that day, she reported it was "more difficult for her to do strenuous activity without pain." (*Id.* at 369.)

On July 13, 2017, Barnard saw Lisa Esterle, D.O., for follow up. (*Id.* at 319.) On examination, Dr. Esterle found Barnard could walk, she had no degenerative changes present, she had no muscle wasting, she had no limp, and she did not use a cane or walker. (*Id.* at 320.)

On October 11, 2017, saw Dr. Esterle for follow up of her high cholesterol and hypothyroidism. (*Id.* at 321.) Barnard reported her back was the same and she had no change in her overall condition there. (*Id.*) Dr. Esterle's examination findings remained the same as those from July 2017. (*Id.* at 322.)

On February 12, 2018, Barnard saw Whitling for pain management and reported her medications were effective. (*Id.* at 341.) Physical examination findings remained the same. (*Id.* at 341-42.) Barnard reported her medications continued to help her function, but she had been taking more Percocet lately. (*Id.* at 343.) Barnard also complained of some nausea and chills before she was due to take her oxycontin. (*Id.*) Whitling instructed her to try a "percocet x 1" at that point, and if it helped, it was probably withdrawal symptoms and staff would need to change the dose of her oxycontin to 10 mg TID. (*Id.*)

On March 15, 2018, Barnard saw Whitling for follow up. (*Id.* at 337.) Physical examination findings remained the same, except Barnard did not have SI joint tenderness that day. (*Id.* at 337-38.) Barnard reported a "slight improvement" in her nausea, vomiting, and chills when she took a Percocet, but

4

it was not significant enough to make a difference yet. (*Id.* at 339.) Whitling noted Barnard was "fairly active with grandchildren and keeping the home now that she does not work." (*Id.*)

On June 13, 2018, Barnard again saw Whitling for follow up. (*Id.* at 493.) Barnard reported her medications were effective, but also said she had been having more cramping in her calves at night and was taking Percocet almost every night. (*Id.*) Physical examination findings remained the same, except Barnard did not have SI joint tenderness that day. (*Id.* at 494-95.) At an appointment in July 2018, Barnard reported she was going on vacation in September and Whitling was working on adjusting Barnard's oxycontin so it could be refilled right before Barnard left for vacation. (*Id.* at 541, 544.)

On September 5, 2018, Barnard saw Whitling for follow up. (*Id.* at 531.) Physical examination findings remained the same, except Barnard did not have SI joint tenderness that day. (*Id.* at 532-33.) Barnard reported she had been hurting more the past few days and the past month she had issues filling her oxycontin prescription because of insurance "confusion." (*Id.* at 534.)

On October 31, 2018, Barnard saw Whitling for follow up. (*Id.* at 521.) Physical examination findings remained the same, except Barnard did not have SI joint tenderness that day. (*Id.* at 522-23.) Barnard reported an episode the night before where her leg cramped for six hours and a Percocet did not help. (*Id.* at 524.) Whitling told Barnard she could take an extra Gabapentin if cramping/burning occurred at night again. (*Id.*)

In December 2018, Barnard saw Whitling for her monthly appointment and reported her medications were effective. (*Id.* at 516.) Physical examination findings remained the same, except Barnard did not have SI joint tenderness that day. (*Id.* at 517-18.) Barnard told Whitling she was having issues with the pharmacy not having oxycontin in stock. (*Id.* at 519.) Barnard mentioned she would be leaving for Hilton Head for the holidays. (*Id.*)

On February 13, 2019, Barnard saw Whitling for follow up.  (*Id.* at 547.)  Physical examination findings remained the same, except Barnard did not have SI joint tenderness that day.  (*Id.* at 548-49.)  Barnard reported she continued to have problems refilling her oxycontin, and she had experienced two episodes of "severe neuromuscular pain in her right calf while driving" that had made her nervous.  (*Id.* at 550.)  Whitling mentioned trying another injection, and Barnard said she would think about it.  (*Id.*)  The two also discussed switching Barnard's medication to Xtampza, which Whitling felt would be ideal for her.  (*Id.*)

On March 14, 2019, Barnard saw Whitling for her monthly pain management appointment.  (*Id.* at 567.)  Physical examination findings remained the same, except Barnard did not have SI joint tenderness that day.  (*Id.* at 568-69.)  Whitling noted Barnard had switched to Xtampza the month before, and Barnard reported increased headaches, nausea, pain, and sweating when it started to wear off, even at direct dosing conversion.  (*Id.* at 570.)  Whitling recommended continuing Xtampza for one more month and noted there was only one other medication Barnard had not tried.  (*Id.*)  Whitling also recommended Barnard take a Percocet late in the day and see if that helped.  (*Id.*)

In April 2019, Barnard saw Tony Lababidi, D.O., for her annual appointment.  (*Id.* at 562.)  Barnard reported Xtampza was only effective for six to eight hours.  (*Id.*)  On examination, Dr. Lababidi found normal cervical and thoracic spine, tenderness of the right paravertebral muscles, midline tenderness at L4-5, mild limitation to extension in the lumbar spine range of motion, positive SI joint tenderness on the right, positive Gaenslen's test, positive FABER/Patrick's test, and positive SI compression/distraction test.  (*Id.* at 563-64.)  Dr. Lababidi further found Barnard's right leg was about ¼ inch longer with the pelvis rotated anteriorly on the right.  (*Id.* at 564.)  Barnard demonstrated normal coordination and gait.  (*Id.*)  Dr. Lababidi increased Barnard's dosage of Xtampza and discontinued Percocet.  (*Id.* at 565.)  Dr. Lababidi scheduled Barnard for a right-sided SI joint injection, and if it

6

provided some relief, recommended she undergo physical therapy for right anterior rotation and right leg discrepancy. (*Id.* at 565-66.)

On May 13, 2019, Barnard saw Whitling for follow up and reported her medication adjustment had been effective. (*Id.* at 582.) Physical examination findings remained the same as Dr. Lababidi had found a month earlier. (*Id.* at 583.) Barnard reported her pain medication now lasted ten hours. (*Id.* at 585.) Whitling added a trial of amitriptyline to held Barnard sleep. (*Id.*)

On May 17, 2019, Barnard underwent a sacroiliac joint injection. (*Id.* at 580-81.)

On May 20, 2019, Barnard saw Dr. Esterle for her annual physical. (*Id.* at 596.) Dr. Esterle noted she had not seen Barnard for a few years. (*Id.*) Barnard reported her injection had not done much good and she had more pain down her right leg. (*Id.*) On examination, Dr. Esterle found Barnard could walk, she had no degenerative changes present, she had no muscle wasting, she had no limp, and she did not use a cane or walker. (*Id.* at 597.) Barnard reported she had a hard time sitting or lying flat and was most comfortable standing. (*Id.*)

On June 13, 2019, Barnard saw Whitling for her monthly appointment and reported the amitriptyline caused vivid dreams. (*Id.* at 602.) Physical examination findings remained the same, except Barnard did not have SI joint tenderness that day. (*Id.* at 602-03.) Barnard reported no relief from the SI injection. (*Id.* at 605.) Whitling recommended trying a Medrol dose pack for acute inflammation and gave Barnard a prescription to have on hand. (*Id.*)

On July 15, 2019, Barnard saw Whitling for follow up. (*Id.* at 611.) Physical examination findings remained the same, except Barnard did not have SI joint tenderness that day. (*Id.* at 611-12.) Whitling noted Barnard's medications were as "effective as possible." (*Id.* at 613.) Whitling continued Barnard's Xtampza and offered Barnard Narcan per Ohio policy due to Barnard's controlled medication levels. (*Id.*) Barnard declined the Narcan. (*Id.*)

**C.     State Agency Reports**

    **1.     Mental Impairments**

On July 2, 2018, Denise Rabold, Ph.D., found no severe mental health conditions. (*Id.* at 124-25.)

    **2.     Physical Impairments**

On May 2, 2018, Indira Jasti, M.D., adopted the ALJ's RFC from the December 8, 2016 decision pursuant to AR 98-4 as there had been no new or material changes since the ALJ's decision. (*Id.* at 113.)

On July 5, 2018, Sreenivas Venkatachala, M.D., determined the ALJ's December 8, 2016 RFC should not be adopted since it was "still pending at the Federal level." (*Id.* at 128.) Dr. Venkatachala opined Barnard could occasionally lift and/or carry 10 pounds and frequently lift and/or carry 10 pounds, she could stand and/or walk for two hours in an eight-hour workday, she could sit for about six hours in an eight-hour workday, and her ability to push and/or pull was unlimited, other than shown for lift and/or carry. (*Id.* at 126-27.) Barnard could occasionally climb ramps/stairs but could never climb ladders, ropes, or scaffolds. (*Id.* at 127.) Barnard could frequently balance, stoop, kneel, and crouch, and could occasionally crawl. (*Id.*) Barnard's ability to lift overhead bilaterally was limited to occasional. (*Id.* at 127-28.) Barnard must avoid all exposure to hazards. (*Id.* at 128.)

**D.     Hearing Testimony**

During the August 6, 2019 hearing, Barnard testified to the following:

- She lives in a house with her spouse. (*Id.* at 57-58.) She can drive and holds a driver's license, but she limits her driving to very short distances. (*Id.* at 58.) Her husband drives everywhere else. (*Id.*) He drove her to the hearing. (*Id.*)

- She is unable to work because she has a lot of trouble standing. (*Id.* at 63.) She can sit for a maximum of 30-45 minutes and can stand about 30 minutes. (*Id.* at 64.)

- Her treatment providers just increased her pain medication a few months ago. (*Id.* at 66.) She has backup pain medication for when her pain levels spike. (*Id.*) She takes a nerve medication and a muscle relaxant. (*Id.*) She tried an injection in May, but it did not help. (*Id.*) Treatment is mainly monthly pain management. (*Id.*) She is not a candidate for surgery. (*Id.*)

- On a typical day, she is very groggy when she wakes up in the morning because of the medications she takes to sleep. (*Id.* at 66-67.) She lays in bed for a while until she feels like she can get up. (*Id.* at 67.) She moves around a lot during the day. (*Id.*) She may sit and watch TV for a bit, then she moves around the house, then she lays down, and continues that throughout the day trying to get comfortable. (*Id.*) She cooks. (*Id.*) She does not vacuum. (*Id.*) Her husband carries the laundry down, but they bought a top load washer and dryer so she can get things in and out more easily. (*Id.* at 68.) She dusts if she can reach from a standing position. (*Id.*)

- Her pain is in her low back and radiates down the back of her thigh through to her calf. (*Id.* at 69.) Her pain is "like having a live electrical wire thrown in water and having that just shooting down, all the way down from [her] back." (*Id.*) She does not use an assistive device to walk. (*Id.*) She does not feel stable on her feet. (*Id.*) When she stands, she keeps her right leg raised to keep the weight off it and is usually holding on to something when she does that. (*Id.*) She favors her left side when walking. (*Id.* at 70.) She cannot focus like she did before. (*Id.*) Her pain medication wears off and she sees it start to taper at about six hours, and then her pain "ramps up." (*Id.*)

The VE testified Barnard had past work as a customer service manager, sales manager, and sales rep for manufactured equipment. (*Id.* at 71-72.) The ALJ then posed the following hypothetical question:

> So can you assume a hypothetical individual of the claimant's age and education with the past jobs you described . . . So will be able to perform sedentary work. And I apologize. *This isn't quite how I phrase things so I'm going to read it to you.* Must be afforded the opportunity to change positions twice each hour for a few minutes on each occasion.
>
> May occasionally operate foot controls with the right lower extremity. May frequently stoop, kneel, crouch. Occasionally crawl, climb ramps and stairs. Never climb ladders, ropes or scaffolds.
>
> May occasionally reach overhead with the bilateral upper extremities. Must avoid concentrated exposure to vibration. Must avoid all exposure to workplace hazards including moving mechanical parts and unprotected heights. Can this hypothetical individual perform any past work?

(Tr. 72) (emphasis added).

The VE testified the hypothetical individual would be able to perform Barnard's past work as a sales manager as classified in the DOT, but not as performed. (*Id.* at 72-73.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists

in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Barnard was insured on her alleged disability onset date, December 8, 2016, and remained insured through March 31, 2020, her date last insured ("DLI"). (Tr. 39.) Therefore, in order to be entitled to POD and DIB, Barnard must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2020.

2. The claimant has not engaged in substantial gainful activity since December 8, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, post-laminectomy syndrome, failed back syndrome, and chronic pain (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she must be afforded the opportunity to change positions twice each hour, for a few minutes on each occasion. She may occasionally operate foot controls with the right lower extremity. She may frequently stoop, kneel, and crouch. She can occasionally crawl and climb ramps and stairs, but never climb ladders, ropes, or scaffolds. The claimant may occasionally reach overhead with the bilateral upper extremities. The claimant must avoid concentrated exposure to vibration and all exposure to workplace hazards, including moving mechanical parts and unprotected heights.

6. The claimant is capable of performing past relevant work as a sales director. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from December 8, 2016 through the date of this decision (20 CFR 404.1520(f)).

(Tr. 41-47.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative

Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In her first assignment of error, Barnard argues the ALJ erred when she adopted the prior ALJ's RFC finding pursuant to *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997) and AR 98-4. (Doc. No. 17 at 10.) The current ALJ's decision was issued over a year after the Sixth Circuit

clarified *Drummond* in *Earley v. Commissioner of Social Security*, 893 F.3d 929, 931 (6th Cir. 2018). (*Id.* at 12.) Barnard asserts that while the ALJ's error would be harmless if the ALJ had taken a fresh look at the evidence, the ALJ instead used the prior ALJ's RFC "as a mandatory starting point in her analysis." (*Id.*)

While the Commissioner concedes the ALJ's decision post-dates *Earley* "and purports to follow *Drummond*," the ALJ "nevertheless provided the 'fresh look' that the Sixth Circuit held, in *Earley* as being required after a previous ALJ decision." (Doc. No. 19 at 7.) The Commissioner asserts that the ALJ's "introductory statement that purports to follow *Drummond* (Tr. 39) is at most harmless error and akin to misplaced dicta." (*Id.* at 8.)

In *Drummond*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond*, 126 F.3d 837, 842 (6th Cir. 1997) (relying on *Senters v. Sec'y of Health & Human Servs.*, 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per curiam). *See also Dennard v. Sec'y of Health & Human Servs.*, 907 F.2d 598 (6th Cir.1990) (per curiam); *Blankenship v. Comm'r of Soc. Sec.*, 624 F. App'x 419, 425 (6th Cir. Aug. 26, 2015). In that case, Drummond's initial claim for SSI was denied when an ALJ found that Drummond retained a RFC for sedentary work. *Drummond*, 126 F.3d. at 838. When Drummond later re-filed her disability claim, a second ALJ found that Drummond retained a RFC suitable for medium-level work, unlike the sedentary RFC finding of the first ALJ, and denied the re-filed claim. *Id.* at 839. After explaining that "*[r]es judicata* applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in Drummond's condition. *Id.* at 841 842. "Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner." *Id.*

In response to *Drummond,* the Social Security Administration promulgated Acquiescence Ruling 98 4(6). The Administration explained:

> This Ruling applies only to disability findings in cases involving claimants who reside in Kentucky, Michigan, Ohio, or Tennessee at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level. It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.
>
> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

Acquiescence Ruling 98 4(6) (S.S.A.), 1998 WL 283902, at *3 (1998) (emphasis added) (footnote omitted).

The Sixth Circuit clarified the scope of *Drummond* and its progeny in *Earley*. In *Earley*, the court found that the "key principles protected by *Drummond*—consistency between proceedings and finality with respect to resolved applications"—"do not prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings." 893 F.3d at 931. The Sixth Circuit explained that *res judicata* applies to subsequent applications for "the same period of time [ ] rejected by the first application." *Id.* at 933. However, "a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994." *Id.* (internal citations omitted). The Sixth Circuit further reasoned:

> While we are at it, we should point out that issue preclusion, sometimes called collateral estoppel, rarely would apply in this setting. That doctrine "foreclos[es] successive litigation of an issue of fact or law actually litigated and resolved." *Id.* at 748-49, 121 S.Ct. 1808. But human health is rarely static. Sure as

> we're born, we age. Sometimes we become sick and sometimes we become better as time passes. Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have "actually litigated and resolved" whether a person was disabled at some later date.
>
> All of this helps to explain why *Drummond* referred to "principles of *res judicata*" with an accent on the word "principles." 126 F.3d at 841-843. What are those principles? Finality, efficiency, and the consistent treatment of like cases. An administrative law judge honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record. *Id.* at 842, *see Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 478 (4th Cir. 1999). This is why it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application.

*Id.*

At the very beginning of the decision in this case, the ALJ stated:

> In accord with the holding in *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997), adopted by the Social Security Administration as Acquiescence Ruling 98-4(6), absent evidence of improvement in a claimant's condition, a subsequent Administrative Law Judge is bound by the findings of a previous Administrative Law Judge regarding the claimant's residual functional capacity. Therefore, because the undersigned finds no change in the claimant's condition since the time of the prior decision, the undersigned is bound to adopt the residual functional capacity finding from that opinion.

(Tr. 39.) Later in the RFC analysis, the ALJ found that "The record shows no appreciable change in the claimant's functioning since the previous decision." (*Id.* at 45.) The current ALJ adopted *verbatim* the RFC from the prior decision. (*Cf.* 43, 85.) Indeed, at the hearing, while providing the RFC hypothetical to the VE, the ALJ apologized for the wording of the RFC and stated it wasn't "quite how [she] phrase[d] things." (*Id.* at 72.)

Considering the foregoing, the Court finds that the ALJ did not properly apply *Drummond* and that error was not harmless. The Commissioner's argument that reversal and remand is not warranted because, consistent with *Earley*, the ALJ provided a "fresh look" at the evidence and the ALJ's statement regarding *Drummond* at the outset of the decision is little more than dicta is unpersuasive. The current ALJ's

16

decision does not reflect that she provided a "fresh look" to Barnard's new application. Rather, the current ALJ stated she was "bound to adopt the residual functional capacity finding from that opinion." (Tr. 39.) This not a fresh look under *Earley*. *See, e.g., Arendt v. Comm'r of Soc. Sec.*, No. 1:18-cv-00484, 2019 WL 1058263, at *10 (N.D. Ohio Mar. 6, 2019) (finding no fresh look under *Earley* where ALJ indicated he was bound by the prior findings); *Cassaday v. Comm'r of Soc. Sec.*, 2018 WL 4519989, at 3* (W.D. Mich. Sept. 21, 2018) (finding that the ALJ's decision did not satisfy the principles set forth in *Earley*—decided after the plaintiff had filed his appeal–as the ALJ did not consider the prior ALJ's RFC as a reference point but started her evaluation of the claimant's RFC bound by the prior ALJ's findings).

As this matter is being remanded for further proceedings consistent with this opinion, and in the interests of judicial economy, the Court will not address Barnard's remaining assignment of error.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION

**IT IS SO ORDERED.**

Date: September 2, 2021           *s/ Jonathan Greenberg*
                                  Jonathan D. Greenberg
                                  United States Magistrate Judge